THE COURT: Yes.

(Conferring with defendant)

MR. TRAINOR: Thank you, your Honor.

Q. Yes, what kind of jobs have you had since you've left school?

A. I worked at a pawn shop and I worked for a cable company, your Honor.

Q. Have you ever been treated recently for any mental illness or addiction to narcotic drugs of any kind?

A. No, your Honor.

Q. Are you currently under the influence of any drug or medication or alcoholic beverage of any kind?

A. No, your Honor.

Q. Have you received a copy of the indictment that sets forth the written charges against you in this case?

A. Yes, your Honor.

Q. And have you discussed those fully with your attorneys, Mr. Trainor and Mr. West?

A. Yes, your Honor.

Q. Are you fully satisfied with the counsel representation and advice given to you in this case by your attorneys, Mr. Trainor and Mr. West?

A. Yes, your Honor.

you have with the Government?
A. Yes, your Honor.
Q. You understand it's not binding on the Court, and I will determine what the appropriate sentence is in your case?
A. Yes, your Honor.
Q. Now I notice that you signed this agreement on June 18, 2001. Is that correct?
A. Yes, your Honor.
Q. Before signing it, did you read it?
A. Yes, your Honor.
Q. Did you read every word of it?
A. Yes, your Honor.
Q. And did you discuss it fully with your attorneys?
A. Yes.
Q. And you signed it as your free act and voluntary act?
A. Yes, your Honor.
Q. Other than this plea agreement, have there been any other promises or assurances made to you to induce you to plead guilty in this case?
A. No, your Honor.
Q. Has there been any duress or coercion exercised upon you to force you to plead guilty in this case?

determined no sexual activity would take place with Amy Shute and clearly demonstrating his control, his lack of influence by other co-defendants upon him and ultimately his decision to point the gun and fire three times killing both victims. See Statement of Floyd in United States v. Day, February 20, 21, 22, 2002, P. 87 where he cannot remember what effect the alleged urgings had on him. Yet this is the testimony of the government's witness.

His animus for defendant Sanchez is clear in respect of his willingness to accuse defendant Sanchez of murder and accuse him of attempted murder on he himself, Floyd's own life, during statements he made to the Johnston police.

Defendant objects to the government's motion for upward departure in this matter in that the government has relied upon case law wherein extreme upward departures to life sentences which the government seeks were applied only in the case of the actual shooter of the victims. United States v. Caracon Cruz, 92 F.3d 5 C.A. 1996. This case is distinguished as in that case the defendant was the shooter who killed four people, two of whom the First Circuit noted were good Samaritans coming to his aid. Id. at Page 7. This case cites the case of Quinones as indicating approval of departures of a 60 percent increase. In this matter, the defendant, age 21, this court were to look at the life

tables contained at 26 CFR 1.401(a)(9)-9 published by the Internal Revenue Service relating to minimum distributions in connection with 401K's and pensions shows that at age 21 the defendant has a life expectancy of 62.1 years. Accepting arguendo the Presentence report calculation of criminal history category 2 level 40 of 324 months or 27 years which would yield a sentence through the defendant's 48th year of life. The government seeks to add by way of upward departure a 130 percent increase to the minimum guidelines sentence calculated by United States Probation.

It is clear that the requested life sentence for a 21 year old individual who did not commit the actual shooting in this case is completely outsized especially in a penal system with no possibility of parole, once a life sentence is given. Such a sentence would be cruel and unusual punishment and a violation of the Eighth Amendment of the United States Constitution.

Even arguendo if the government's version of events is accepted and the defendant was heard to say that he favored the killings and would do so himself, those said statements in the worse light amount to statements of bravado in the face of one's peers, and it is clear that said statements had no impact on Gregory Floyd who was ready, willing and able to conduct the murders having clothed himself in

rubber gloves, maintained control of the firearm, completely ruled out any rape attempt on the female victim, demonstrating his self possession and command and Floyd's personal shooting and killing both victims in cold blood accomplished instantaneously. Gregory Floyd demonstrated himself to be impervious to the influence of other defendants despite his protestations to the contrary. It is highly probable given the animus that Floyd had towards Sanchez and his willingness to make prior accusations against him to save his own skin and that of Anderson to do likewise, that the statements were probably never made; but even if made, hardly rise to the level of that of the prime actor who willingly carried out the execution. Floyd when asked in the trial of Kenneth Day why he didn't just turn the gun over to Samuel Sanchez and let him go ahead and carry out the murder that he attributed having been suggested by Mr. Sanchez, stated he didn't know why. By retaining control of the gun he removed any possibility of Sanchez, if he had said these things, from changing his mind, putting the gun away, leaving the scene or letting the victims go. Floyd took fully responsibility for the killing of these individuals.

With respect to the government's motion [illegible] departure [illegible] conduct, the First [illegible]

Appeals in United States v. Rivera A3 F.3d 542, C.A.1 1996 (rehearing and rehearing on banc denied) rejected the government's motion for upward adjustment where carjacker's rape of his victim although degrading, heinous, cruel and brutal, did not justify enhancing sentence for causing victim "extreme mental trauma" where Presentence report stated the victim received no professional counseling or assistance after the crime, relying instead on support of her family and boyfriend and victim's generalities to probation officer that her ordeal had a devastating effect on her life, family and consensual relationships fell short of proof measuring up to "protracted: impairment of: mental faculties" sufficient to justify additional ten year sentence. In the instant matter it is clear that the victim suffered a terrible and tragic death; however, that fact is fully taken into account in the extraordinarily severe sentences at the utmost range of the guidelines which the guidelines require for this offense. 2B 1.3 guideline indicates adjustments are made for abduction, serious bodily injury, all the way up to the ultimate adjustment for death. The government's request for this departure ground ought to be rejected on this basis.

Defendant Sanchez has been subject to certain immutable facts regarding this case. First, the government

6

that the Court, in this case, to give a sentence within the sentencing range. That range is going to be a very serious amount of time for this young man to serve. I understand this Court's sentencing philosophy. I understand the considerations the Court gives to Gluck studies and other studies that have gone into the propensity for future violence. I'm suggesting that what we have here is a 22 year old, your Honor, with juvenile records, wayward charges. I don't think it's an overrepresenting criminal history at this point, your Honor. The charges that are out there unadjudicated, haven't even been filed an information or an indictment, and the co-defendant was in the news was locked up for I can't recall exactly how long but well in excess of the time allowed and not given bail. He was only recently bailed, and there's a statute that says within 6 months of filing those complaints they're supposed to file an information or an indictment. So there may be constitutional questions. As well. I'm not his lawyer on those cases. I'm suggesting to the Court that those cases probably don't form the best basis for this Court to give a criminal history upgrade, and I suggest you turn the Government down on that ground.

With respect to the criminal enhancement for

extreme conduct, your Honor, the cases, and I briefed this issue but I'll mention it briefly, the cases on extreme conduct seem to show prolonged activity over periods of time where people are -- all these cases are bad but those cases seem to be especially bad in terms of the things that the people had to endure, like the people locked up in the hold of a ship on immigration smuggling cases. That one comes to mind. No food, water, or fresh air., things of that nature. There's a period of time. There's an aspect of torture. There's things of that nature. Any death has -- any murder is going to have aspects of loss of life and the grief and the suffering and the fear that goes with it, but I think that in the law there's this extra category, and I'm suggesting this isn't in that category.

And, you know, the use of the gun in this case, your Honor, the guidelines themselves recognize that the most, that the heartland gun in the case is the semiautomatic weapon, so I don't think that that provides an independent basis. I think that the philosophy, your Honor, of the sentencing guidelines took us out of a parole based system and put us into a non parole based system, and the sentences calculated by the numbers are suppose to take into account what a sentence would be in time served of a defendant who

could have possibly gotten parole. That's what this case is, your Honor. And this defendant, if he was charged over in the state, might have gotten parole. I don't know what would have happened in their system. They may have opposed it forever, but what I'm suggesting here is I don't know what happened in the federal system, that's well before my time, in terms of how a federal judiciary would have -- a federal justice system would have reacted to parole possibilities for this defendant if he was sentenced to a term of years. But I do know this, that the sentencing guidelines are reportedly structured to set a sentence that takes into account the possibility of -- what he would have gotten with the possibility of parole, and this defendant by the way the guidelines are structured, all other things excluded for the moment, gets a term of years under that calculation, and now you have to move beyond -- the Court has to move beyond that structure and move into the realm of saying this case is outside the heartland of other murder cases. Remember, that's a murder guideline, 2(a)1.1. That's how we got to where we are. The Government wants an adjustment for abduction, but understanding that the carjacking walks you through the robbery guideline which clearly has an enhancement for abduction. It's right in the

guideline. The Government's own cases refer to the adjustment for abduction. So to my mind, and I think a fair reading of the case law is, that abduction's in the guideline, because we go through the robbery guideline, we come up with an enhancement for that, we come up with an enhancement for the firearm, and then we come up with an enhancement for the death by virtue of the reference over to 2(a)1.1, and that comes out to a term of years if the Court calculates it and gets to level 40, where it would under the presentence report, as put together by the United States Probation Department. So I think that while, you know, the Court could depart upward on some of these other grounds, I have in my papers indicated that we understand that, the fact of the matter is that in most of the cases where these upward departures occurred, the offense levels were very low, your Honor, and the Court departed upward to bring the crime into the range of the more serious defenses -- offenses, I should say, and I've outlined in my response to the Government's motion for a downward depature. All of those cases where case after case presented by the Government comes from an extremely low guideline, something like 60 months, and brings it up to maybe 120 month. This case is way beyond that, way beyond that. The defendant

here will serve more than he ever lived -- even lived under just the basic level 40. And what I'm saying to you today, your Honor, is that what the Government wants is the equivalent of a 62 year sentence because that's what his natural life is, if you look at the federal government's life expectancy table as issued by the IRS. I think I calculated it to be about 130% departure if you go to life over what it would be if you gave a level 40 sentence. There's some case law that suggests you could do a double level departure. I think that's an extremely low offense level case where the offense level was increased 100 percent to a greater offense level. They want to go beyond that. And I understand the Court's sentencing philosophy. I'm just suggesting that even if you go up to the level that's suggested, 41, 42, that you could still give a sentence, your Honor, the Court could still give a sentence within a term of years that would allow for some period of time that the defendant did not serve the rest of his life in prison. I think that covers the arguments, and I would incorporate by reference both my memorandum in support, my sentencing memorandum and my memorandum opposing the Government's upward departure. Thank you very much.

THE COURT: All right. Mr. Sanchez, do you

The defendant made a plea bargain in this case and pleaded guilty to escape the death penalty. That was his plea bargain. There is a suggestion in the papers filed by the defendant's attorneys that the Government was not honoring the plea agreement. It's clear from the language of the plea agreement that the plea agreement was honored, and that both sides were free to argue guideline issues and departure issues, and the Government was free to argue that there should be an upward departure in this case. There was no violation of the plea agreement.

As I've indicated, this defendant is as culpable and guilty as Floyd, and what I said when I sentenced Floyd applies here. I would impose the death penalty on this defendant if I had that power, but I don't. The only power I have is to separate him from society for the rest and remainder of his natural life.

So on Count II, the count of carjacking death resulting, I impose a sentence of life imprisonment.

On Count I, the conspiracy count, I impose a sentence of 60 months to be served concurrently with the sentence on Count II.

If per chance the federal government returns to a parole system, I will place the defendant on

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR. No. 00-141L |
| | : | |
| SAMUEL SANCHEZ | : | |

**PLEA AGREEMENT**

Pursuant to Rule 11(e)(1)(B) of the Federal Rules of Criminal Procedure, the United States and Defendant, SAMUEL SANCHEZ, have reached the following agreement:

1. Defendant will plead guilty to the Indictment which charges conspiracy and carjacking resulting in death. 18 U.S.C. §§ 2, 371, and 2119(3) .

2. In exchange for Defendant's plea of guilty:

   a. The government agrees not to seek the death penalty.

   b. The government will recommend that the Court impose a term of imprisonment from within the range of sentences for the offense level determined by the Court under the United States Sentencing Guidelines (the "guidelines"). There is no agreement as to which guideline offense level applies, including any adjustments or departures that may apply to the Defendant's case. Both the Defendant and the



SS

government reserve their right to argue or present evidence on sentencing guideline issues. The Defendant understands that the government is free to recommend any sentence from within the resulting guideline range, including the longest sentence permitted in that range.

c. For purposes of determining the offense level, the government agrees to recommend a 3-level reduction in the offense level for acceptance of responsibility under §3E1.1 of the guidelines provided that the Defendant abides by all the terms of this plea agreement, commits no new offenses, and does not obstruct or attempt to obstruct justice.

d. The government is free to recommend any combination of supervised release, fines, and restitution which it deems appropriate.

3. The maximum statutory penalties for the offenses to which Defendant is pleading are as follows:

Count I

a. 5 years imprisonment;

b. a fine of up to $250,000 or twice the amount of the gain or loss from the offense, whichever is greater;

c. a term of supervised release of up to 3 years; and

d. a mandatory special assessment of $100; and

contemplated by the plea agreement. In exchange for the defendant's plea of guilty, the Government has agreed not to seek the death penalty in this case. We will make a recommendation within the guideline range, but there is no agreement as to which range is applicable in this matter. The defendant and the United States reserve the right to argue or present evidence on which guideline range applies, or any guideline issues raised, including adjustments or departures to the guidelines. The defendant understands that the Government is free to recommend the longest sentence allowed by law. There is a promise for a recommendation of a three level reduction for acceptance of responsibility provided that the defendant abides by the terms of the plea agreement, commits no new offenses, and does not obstruct, or attempt to obstruct justice. The Government is free to recommend any combination of supervised release, fines or restitution deemed appropriate. Essentially, your Honor, it's an open-ended plea agreement except for the death penalty and acceptance of responsibility promises. The Government can recommend any appropriate sentence under the guidelines, including the statutory maximum.

you have with the Government?
A. Yes, your Honor.
Q. You understand it's not binding on the Court, and I will determine what the appropriate sentence is in your case?
A. Yes, your Honor.
Q. Now I notice that you signed this agreement on June 18, 2001. Is that correct?
A. Yes, your Honor.
Q. Before signing it, did you read it?
A. Yes, your Honor.
Q. Did you read every word of it?
A. Yes, your Honor.
Q. And did you discuss it fully with your attorneys?
A. Yes.
Q. And you signed it as your free act and voluntary act?
A. Yes, your Honor.
Q. Other than this plea agreement, have there been any other promises or assurances made to you to induce you to plead guilty in this case?
A. No, your Honor.
Q. Has there been any duress or coercion exercised upon you to force you to plead guilty in this case?